IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DR. KRISTEN BENNETT, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| TARRANT COUNTY COLLEGE | § | |
| DISTRICT, | § | |
| | § | |
| *Defendant*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Dr. Kristen Bennett files this Original Complaint complaining of Defendant Tarrant County College District and in support thereof would show the court as follows:

### I.     JURISDICTION AND VENUE

1.1     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, 1343, and 1367. This case is brought under the First, Fifth, and Fourteenth amendments to the Constitution of the United States and pursuant to 42 U.S.C. § 1983 and 1988.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b), as all or a substantial part of the events giving rise to Plaintiff's claims arose in this district.

1.2     Pursuant to 42 U.S.C § 1983 Plaintiff alleges herein one ongoing violations of federal law and seeks relief of injunctive nature, as well as monetary damages.

1.3     All of the conduct alleged herein by Defendant was done by policymakers of the defendant district and under the policies of the defendant district. Such action was done under the color of law.

## II.    PARTIES

2.1    Plaintiff is a Texas citizen and at all relevant times resided in Tarrant County, Texas.

2.2    Defendant Tarrant County College District ("TCCD") is a community college district organized and existing pursuant to the laws of the state of Texas for the purpose of operating a system of community colleges in and around Tarrant County, Texas. TCCD is a state actor within the meaning of the United States Constitution and the actions complained of herein comprise state action and were taken under color of law. The address of TCCD's administrative office is 300 Trinity Campus Circle, TRWF A18, Fort Worth, Tarrant County, Texas 76102. TCCD may be served with process by serving its chancellor, Eugene Giovannini, Ed. D., at the foregoing address.

## III.    FACTUAL BACKGROUND

**Plaintiff's Early Employment with TCCD**

3.1    Plaintiff Dr. Kristen Bennett has been employed by the Defendant district as Executive Vice President for Advancement beginning on October 1, 2020. The Defendant district claims to have terminated her employment as of January 31, 2022.

3.2    Dr. Bennett holds a doctorate in educational leadership and policy studies from Eastern Kentucky University, an MBA from Midway University and a Bachelor of Science degree in communications and information studies from the University of Kentucky. She has an unblemished professional record. Dr. Bennett is a 22-year fundraising veteran who in 2020 won the Council for Support and Advancement of Educations (CASE-Washington, D.C.) Educational Fundraising award. She holds several certifications in related fields and is highly respected among her colleagues. She became an employee of the district and, simultaneously, as a part of her duties,

was to serve the Tarrant County Foundation and its board of directors in its critical responsibility of raising funds for the district.

3.3     From the date of her hiring on October 1, 2020 until July 13, 2021, she received nothing but praise from Chancellor Giovannini. (Note: Dr. Bennett and her team were virtual until July 5th, 2021.) In fact, Dr. Bennett was the Chancellor's chosen team member brought in to replace the previous leader, McIntosh, in his role because the chancellor believed the McIntosh wasn't doing a good job and just stopped talking to McIntosh. The Chancellor also told the executive committee prior to Dr. Bennett's arrival that they either run the Foundation his way (while acting like he was rolling up his sleeves) or he would get rid of the Foundation and run it internally himself. During Dr. Bennett's tenure however, the Chancellor kept the previous leader, Joe McIntosh, in Dr. Bennett's office during her entire tenure, despite the recommended advice of the COO, Susan Alanis, of having the previous leader McIntosh work from home on paid leave until his retirement on Jan 31, 2022.

3.4     On July 13, 2021, the female employee in question, a subordinate of Dr. Bennett fell into a conflict with a fellow employee who then complained to Dr. Bennett. Dr. Bennett met with the female employee in question who was a member of her team and politely informed her that she must get along with other members of the team and asked if she would apologize to the other employee. (Dr. Bennett did not know at that time that the female employee in question had threatened the fellow employee by stating to yet another employee that the female employee in question's fellow employee "made her so mad she wanted to choke her until her tongue comes out".)

3.5     Dr. Bennett, up until that point, had a great relationship with the subordinate, even going so far as to encourage her verbally and in writing via texts, to help her believe in herself.

3.6      Dr. Bennett even went so far as to try and get the subordinate and entire team promoted to positions and restructure the team for success, but the Chancellor wanted to go another direction.

3.7      Nor was, Dr. Bennett aware at that time of the extent of the inappropriate, personal relationship that the female employee in question had with Chancellor Giovannini. While Dr. Bennett had heard reports or rumors about such a relationship, she had not heard the female employee, herself, boast about the relationship at that time; rather, Dr. Bennett had merely seen what she viewed as an unusual event between Chancellor Giovannini and the female employee in question and had heard rumors of the woman's boasting about an inappropriate relationship with Giovannini.

**Dr. Giovannini's Changed Attitude toward Plaintiff**

3.8      This event (Dr. Bennett's counseling with the woman about the employee's conflict with others) was the beginning of serious trouble for Dr. Bennett, as will be explained below.

**Nonrenewal of Plaintiff's Contract and the Development Plan**

3.9      Over the next four weeks, the female employee in question continued to be fractious and to cause trouble within the team, for which Dr. Bennett spoke to her and asked for correction of her behavior.

3.10     On August 17, 2021, Chancellor Giovannini summoned Dr. Bennett to his office where they met alone, behind a closed door. In this meeting, the behavior of Giovannini had obviously changed toward Dr. Bennett. He claimed that he was concerned about Dr. Bennett's performance at a recent meeting in which he said that she had been "boastful". Dr. Bennett assured Giovannini that she was regretful if she had sounded boastful and volunteered to apologize to anyone at the earlier meeting if she had offended anyone. She did that. Giovannini responded that

the other persons who had been present "do not matter" and that "only (he) mattered" and that he was "offended" by Dr. Bennett's perceived boastfulness.

3.11    On August 30, 2021, Giovannini called Dr. Bennett into his office yet again. He informed her that he would not be renewing her employment contract which ended the next day, on August 31, 2021. Giovannini told Dr. Bennett that he had "issues" with Dr. Bennett, although he did not say what they were; rather, he said he was going to place her on an Executive Development Plan, similar to what is commonly known in the district as a "PIP" or personal improvement plan.

3.12    During the meeting on August 30, Giovannini threw an envelope across the desk at Dr. Bennett and said, "What is this?". The envelope had a religious sticker on the back of it and Giovannini asked Dr. Bennett if she was responsible for that. She told him that she was not and that she knew nothing about it, which was true. Dr. Bennett then informed Giovannini that the female employee in question (with whom he had the inappropriate relationship) was the person who probably placed the religious sticker on the envelope in that she was the employee responsible for handling that kind of correspondence. At that point, Giovannini summoned his Chief of Staff and ordered her to find the female employee in question involved who, as it turned out, was not at work that day.

3.13    Giovannini then asked Dr. Bennett if she (Dr. Bennett) had given the female employee in question permission to use the religious sticker and, of course, Dr. Bennett informed him that she had not done so and would never do so in that the correspondence was that of a public institution and not permitted to use religious materials in such a manner. At that point, Giovannini dismissed Dr. Bennett saying, "that's all" and added that they would meet tomorrow to discuss the anticipated "PIP".

3.14    The next day, August 31, 2021, that meeting occurred, again with only Dr. Bennett and Giovannini in the room. Giovannini handed her a copy of the document and went over it with Dr. Bennett. Dr. Bennett listened and said, "yes sir" and did not contest the contents of the "PIP" with Giovannini. He told Dr. Bennett that she was not having her contract renewed, as he had said the previous day, and that she would be on this "PIP" though December 31, 2021. He told her that she could be "let go" at any time. He said that he would be meeting with Dr. Bennett about every 2 weeks to go over her "progress".

3.15    Dr. Giovannini instructed Dr. Bennett not to send him any emails or written correspondence and that she should only bring any written reports or documents to him in person at such future meetings. Giovannini told her during that meeting that he did not want "any paper trail"; the result, of course was that the HR department was not perceptibly involved. Dr. Bennett had only been at the TCCD 10 months and had not received any prior reviews nor her annual review. Dr. Bennett knew TCCD HR had a progressive discipline HR policy of multiple warnings, written and other forms of correction for employees.

3.16    On September 10, 2021, another incident occurred involving the female employee in question with whom Giovannini had the inappropriate relationship. That employee had sent an inappropriate and ugly email to another member of the team. Dr. Bennett had reached out to the HR department representative, Dimitri Hall, on September 13, 2021 to ask for help in dealing with this female employee. The HR department representative, Dimitri Hall, instructed Dr. Bennett to meet with the employee and to verbally counsel with her in an effort to correct her behavior. Dr. Bennett followed the direction of Dimitri Hall and did as she was instructed and asked the employee to apologize and correct her behaviors. Only a few days later, the next meeting with Giovannini occurred at which his demeanor grew even more hostile toward Dr. Bennett.

3.17    Dr. Bennett and Giovannini met again on September 22, 2021, in his office and without others present. Giovannini claimed to have several complaints about her "progress" although he did not tell her what they were, Giovannini was visibly angry.

**Plaintiff's Meetings with a TCCD "In-House" Counsel**

3.18    In the meeting of September 22, 2021, Giovannini said he was giving Dr. Bennett "permission" to speak to him about more issues; i.e., from the beginning of the meetings, Giovannini had told Dr. Bennett that she could not speak to him about anything other than four issues and she had complied with that direction. Obviously, Giovannini wanted to be in complete control of the dialogue so that it could not wander into other areas which might be troublesome to Giovannini. During that meeting of September 22, 2021, he then decided to give her "permission" to speak to him about other matters and to speak with the presidents of other campuses about certain, limited matters.

3.19    On October 5, 2021, Giovannini and Dr. Bennett met again in his office with no one else present. The meeting was uneventful.

3.20    The next meeting occurred, again in his office, on October 19, 2021. That meeting was largely uneventful, too.

3.21    Then, on October 28, 2021, a very significant event occurred. One of the "in house" attorneys for the school district went into Dr. Bennett's office and asked her if she had heard anything about an inappropriate relationship between Giovannini and the female employee mentioned earlier herein. Dr. Bennett responded to the attorney's request and told her that the employee in question had recently informed Dr. Bennett of certain things about Giovannini. For example, the female employee had told Dr. Bennett (and Dr. Bennett reported to the District's Associate Internal General Counsel) that Giovannini was "really a good guy" and that he had

written a letter to a judge (or someone) to help the employee out because she had been charged with a DUI or a DWI. Dr. Bennett told the District's Associate Internal General Counsel  at that time that the employee had recently informed Dr. Bennett that the employee had been golfing with Giovannini several times, that he had visited her home to console her about a matter, and that Giovannini and the employee had visited the Silver Leaf Cigar Lounge in downtown Fort Worth on more than one occasion. Dr. Bennett reported that she had observed Giovannini and the female employee in question embracing each other on one occasion and conversing in an obviously personal manner. By that time, Dr. Bennett had learned that the employee had boasted to several people on her staff over a period of several years.

3.22    Also, during the meeting with the District's Associate Internal General Counsel, the District's Associate Internal General Counsel informed Dr. Bennett that Dr. Bennett should start a "fit for duty" human relations consult about the employee. The female employee in question involved with Giovannini had previously told Dr. Bennett that the female employee in question thought she might be losing her mind and she asked Dr. Bennett to assist her in getting help from the employee assistant program through HR. Dr. Bennett reported that, also, to the District's Associate Internal General Counsel. The female employee in question had asked Dr. Bennett to assist her in getting FMLA benefits and Dr. Bennett supported the employee doing so.

3.23    During that meeting with the District's Associate Internal General Counsel, Dr. Bennett reported that the employee involved with Giovannini had showed Dr. Bennett several texts between Giovannini and the female employee in question, saying that they stayed in touch with each other frequently by that means.

3.24    During the meeting with the District's Associate Internal General Counsel, Dr. Bennett was told that this information "was not enough to start an investigation of Giovannini".

3.25    The District's Associate Internal General Counsel told Dr. Bennett during that meeting that there were rumors in the community of some inappropriate relationship between Giovannini and the female employee in question and that the then-sitting president of the board of trustees of the college district had even met with Giovannini to warn him that he should stop that conduct with the female employee in question. At that point, the District's Associate Internal General Counsel stated that the employee must be "[expletive] crazy" and that "the Chancellor was so stupid. Why couldn't he have had an affair with someone more appropriate and outside of Fort Worth".

3.26    On November 1, 2021, The District's Associate Internal General Counsel met again with Dr. Bennett. She informed Dr. Bennett that, in her view, the matter should never have been put into a "PIP" and that she would have returned it to Giovannini had it been given to her or HR per the policy. On November 2, 2021, the District's Associate Internal General Counsel and Dr. Bennett met again. The District's Associate Internal General Counsel picked Dr. Bennett up behind the main building and took Dr. Bennett to Chick-Fil-A. The District's Associate Internal General Counsel explained how Dr. Bennett should word the "Fit for Duty" request about the employee. The District's Associate Internal General Counsel gave direction to Dr. Bennett as to how to draft the request to be sure it reflected the urgency of the situation, i.e., the dangerous mentality of the female employee involved. The District's Associate Internal General Counsel also urged Dr. Bennett to respond in writing to Giovannini concerning the "PIP" because she said, "it needs to be on record". The District's Associate Internal General Counsel told Dr. Bennett that she should file a grievance against Giovannini.

3.27    The District's Associate Internal General Counsel said again that the items "were not PIP worthy". The District's Associate Internal General Counsel explained to her the buzz

words and language to use in the HR consult for the "fit for duty" inquiry and how to respond to the grievance against Giovannini. In this meeting, the District's Associate Internal General Counsel told Dr. Bennett that "you don't deserve this and that you have been a rock star your entire career; heck you even turned around (another) employee."

3.28    When she returned to her office on November 2, 2021, Dr. Bennett started the HR Consult process for the female employee in question with HR department via email.

3.29    All six of the team members (employees working under Dr. Bennett) wrote statements to the HR department supporting the request for the "fit for duty" services. Even a student wrote in support of the request, alleging that the female employee in question had made seriously inappropriate comments to the student. During the process of submitting the application for "fit for duty" assistance through the HR Department, substantial additional evidence of the mental instability of the employee in question came forward to Dr. Bennett, some even indicating threats of violence by the employee.

3.30    Dr. Bennett's final meeting with Giovannini occurred on November 10, 2021. Giovannini was in such a foul humor that he did not even engage in meaningful conversation with Dr. Bennett.

3.31    By November 15, 2021, Dr. Bennett was living in fear of losing her job and even her professional reputation because of Giovannini's anger towards her and because of the events described above. Indeed, she had some fear for her own safety because of the expressions of lunacy and violence which had been reported and made by the female employee in question. Accordingly, Dr. Bennett did not feel that she could emotionally go on with her life under these circumstances and decided that she must resign, even though she did not want to leave her job that she loved. Having realized that she was trapped in the web of the relationship between Giovannini and the

female employee in question and seeing utterly no way to get out of that trap without being fired by Giovannini (with the accompanying damage to her professional career), she thought it best to resign. On November 19, Dr. Bennett was given permission from the chief of staff and the Chancellor to share news of her resignation with the Cabinet and her team. Simultaneously, the Chancellor shared with the Board of Trustees and the Chair of the TCC Foundation, and sent an email to the TCC Foundation board. Upon receiving the news of her departure many cabinet, staff and board reached out to Dr. Bennett. One board member in particular, Conrad Heede, former President of the Board of Trustees and current Foundation board member asked for a meeting with Dr. Bennett on November 24th. At the meeting on the 24th between Mr. Heede and Dr. Bennett, Dr. Bennett shared everything that had occurred since July 13th and that she (Dr. Bennett) was filing a grievance. Mr. Heede then shared his support of Dr Bennett's filing of a grievance and asked permission to share with Ken Barr and Teresa Ayala. Dr. Bennett gave Mr. Heede permission to share and awaited his response over the next week.

3.32    Dr. Bennett submitted her resignation on November 15, 2021; however, she rescinded that resignation on December 2, 2021, and filed her grievance against Giovannini. These actions were taken by Dr. Bennett after reflecting over the Thanksgiving break, talking with her husband, and deciding that she must stand up to the oppression and injustice that Giovannini was perpetrating upon her. Dr. Bennett did not know that she was entitled to a due process type hearing at that point or at any point prior thereto. Had she known, she would have requested such a due process hearing.

3.33    On the same day that she rescinded her resignation, she filed a grievance against Giovannini.

3.34    Then on December 8th, at a donor fundraising event, Mr. Heede was excited and came up to Dr. Bennett and shared the good news that he had shared her story with Teresa Ayala and Ken Barr and that they told Mr. Heede that they were going to meet with Dr. Bennett and help. However, this never happened and instead, on December 9th, Dr. Bennett was told by the Director of HR that she was being put on paid leave.

3.35    Dr Bennett had been contacted via email by Osvaldo Gomez, HR Title IX Coordinator, on December 2 stating that he was going to conduct a thorough review of her grievance and that he would be contacting her early the following week for additional information. Then on December 7th, Osvaldo Gomez emailed stating, "He is still in process of reviewing her concerns and will follow up with her regarding next steps before the end of the week". That never happened.

3.36    Instead, on December 9, 2021, the HR director called Dr. Bennett and informed her that she was being placed on administrative leave per the recommendation of the foundation board and governing board while the district would conduct a third-party investigation. However, it was later learned that neither the foundation board nor governing board knew of this recommendation to place Dr. Bennett and instead were told in the December 10th Foundation board meeting with board and Foundation staff that Dr. Bennett decided to go ahead and leave TCC to pursue other opportunities and were not told about rescinding her resignation nor grievance. In fact, the only reason Dr. Bennett found out that the recommendation and discussion at the board meeting was wrong is because several board members called on December 10th to see where she was and how she was doing.

3.37    Then on December 8th at a donor fundraising event, Mr. Heede was excited and came up to Dr. Bennett. He shared the good news that he had shared her story with Teresa Ayala

and Ken Barr. They told Mr. Heede that they were going to meet with Dr. Bennett and help her. However, this never happened and instead, on December 9th, Dr. Bennett was told by the Director of HR that she was being put on paid leave.

3.38    When the director of HR called on December 9th, she also said that "you've done nothing wrong, and we are doing an independent third-party investigation of the matters in your grievance." Dr. Bennett has yet to be allowed to her pictures, books, degrees, and personal items from her desk at TCC.

3.39    In fact, Dr. Bennett has now learned that the Defendant District has hired a Dallas lawyer to conduct what they called an "independent investigation"; however, Plaintiff is not informed as to who is being investigated or what is being investigated with enough specificity to report that to this Court. Further, in the last few days, Plaintiff's attorney has been contacted by yet another law firm in the mid-cities saying that the District has now hired his firm to conduct a separate investigation of the female employee in question involved and another male employee or former employee of the District. Plaintiff has agreed to cooperate with both investigations and has given a lengthy interview to the Dallas firm already. Dr. Bennett has still not been contacted regarding the consult filed on November 2nd and 3rd to get help for subordinate.

3.40    The Defendant District terminated Dr. Bennett's employment as of January 31, 2022, despite Plaintiff's objection. In fact, Plaintiff made respectful, written demand for a due process hearing before the effective date of that termination by letter dated January 14, 2022. The District denied that request for due process by letter dated January 25, 2022, by sending a letter to Plaintiff's counsel. In that letter, Defendant District officially took the position that "as a result of Dr. Bennett being placed on an executive development plan … on August 31, 2021, Dr. Bennett was not issued an employment contract for the 2021-2022 academic schoolyear". Further, the

Defendant District announced in that letter that "Dr. Bennett also resigned her position" and that, therefore, she is not entitled to a due process hearing. Defendant District's letter fails to address the fact that she withdrew her resignation and the resignation itself was a result of the coercive forces described above and constituted a wrongful and constructive termination of her position.

3.41    Further, the District has terminated Dr. Bennett's employment even before the District, itself, gets the results of the "investigation" which it employed Dallas counsel to conduct. When Plaintiff requested the results of the investigation on January 25, 2021, Defendant's hired lawyer simply stated that it would not be ready soon.

3.42    The cesspool of events described above are the direct product of the breach of trust owed by Giovannini to the District and its employees and to the tax-paying public. The Defendant District has a recent and long history of wrongfully denying procedural due process to employees who have been wrongfully terminated without that due process, misfeasance and malfeasance which has cost the School District many thousands of dollars already. The District has again embarked upon that course against your Plaintiff.

## IV.    CAUSES OF ACTION

The following causes of action are pled alternately insofar as same may be necessary.

### A.    Breach of Contract

4.1    Plaintiff alleges a state court pendant cause of action for breach of contract. Plaintiff had a contract of employment at all relevant times and that contract included the policies of the School District. Defendant breached that contract by violating many of its own policies, some of which are set out below. This conduct described below also violated Plaintiff's constitutional, Title VII and Title IX rights:

1. Defendant, through Giovannini, harassed and abused plaintiff because of his belief that Dr. Bennett was not treating Giovannini's "girlfriend" well; (policy, DH (Local)  DGBA (Local)  #1, 2, 3, 7, 8 & highlighted paragraphs. DMAB);

2. Defendant punished Plaintiff, a female, without cause but gave Giovannini, a male, preferential treatment even though he was guilty of multiple policy and legal violations, as described herein, thereby discriminating on the basis of gender against plaintiff; (policy DGBA (Local), DH (Local);

3. Giovannini and the district failed to give Dr. Bennett written notice of her non-renewal, in violation of policy DM (local) page 3, paragraphs 1, 2, 4, Page 4, Paragraph 2, Page 5;

4. Defendant, through Giovannini, prohibited Plaintiff from sending emails or documents regarding the "PIP" to the HR department or others and told her she could not discuss the matter, so that it would be "confidential"; (Policy DM Local requires a nonrenewal to go thought the HR department prior to any action being taken and cannot be retaliatory);

5. Defendant, through Giovannini, retaliated against plaintiff for speaking to the female employee in question for corrective action i.e., for doing her duty and meeting her responsibility to supervise that employee (policy DGBA (Local), DH (Local));

6. Defendant retaliated against Plaintiff for filing a grievance, placing her on leave and barring her from campus (Policy DI8A local and policy DGBA local, paragraph 9);

7. Defendant, through Giovannini, unjustifiably placed Plaintiff on the "PIP" in retaliation for Plaintiff's conduct toward the female employee involved, who was involved with Giovannini, i.e., for Plaintiff's meeting her job responsibility in violation of policy DM local, DGBA (Local);

8. Defendant violated policy DH (local) by denying plaintiff's right of due process both constitutional and contractual;

9. Defendant Giovannini violated Policy DH (local) by his having a relationship of an amorous or sexual nature with a subordinate female employee and thereby compromising "the special trust between the College District and the citizens it serves."

10. Giovannini violated Title IX by creating a hostile work environment in that he punished Plaintiff for conduct of speech that he did not find offensive in males, thereby imposing gender stereotyping upon plaintiff.

4.2      As a direct and proximate result of Defendant's breach of contract, Plaintiff has been damaged as set out below.

**B.      Violation of the First Amendment (Free Speech)**

4.3      Plaintiff exercised her protected free speech by filing a grievance against Giovannini. That action was not done in the course of performing her duties as an employee but was, rather, outside the scope of her usual duties. Her grievance contained comments of public importance. Defendant's terminating and/or non-renewing Plaintiff's employment was an act of retaliation against Plaintiff for her exercising of this protected First Amendment free speech, which is a liberty interest, and such speech was a motivating factor in Defendant's decision to do so. Plaintiff has been damaged as described below as a direct and proximate result of this wrongful conduct by Defendant.

**C.      Due Process Violation**

4.4      Plaintiff had a protectable property interest at all relevant times in her employment relationship with the Defendant District. The policies of the District become a part of Plaintiff's employment contract, whether that contract be for a term or at-will and Defendant District terminated and/or non-renewed that formal term contract and her contractual right of due process thereafter without offering or providing Plaintiff with a due process hearing which is and was a prerequisite to any such adverse employment action. Indeed, , the Defendant's Policy DH (local) provides as follows:

> 1.      In order to express the affirmation of the College Districts professional responsibly more adequately, the employees of the college district, with the full support of the board, do adopt and hold ourselves and each other subject to the following "code of professional ethics: "Support the right of Due process for all".

4.5    Thus, in addition to her constitutional right of due process Plaintiff had a contractual right of due process.

4.6    Although the contractual right of due process is clearly set out as above quoted defendant has a practice of denying employees such procedural due process and has done so in this case. Plaintiff was denied her liberty interest in speech, as well as due process. The denial of such due process was made in this case by a policy maker and confirmed by its attorney with the authority and approval of the board.

4.7    Defendant District has a policy of refusing a due process hearing in a situation such as this and that policy is promulgated, ratified, and applied by policy makers of the District, as was done here.

4.8    Plaintiff was unaware that she had a right to procedural due process as that time Giovannini informed her he was non-renewing her contract, nor did she learn that she was entitled to such a hearing until she employed the undersigned counsel who made demand for such a due process hearing. Defendant has categorically denied Plaintiff's request for a due process hearing.

4.9    Further, Defendant has initiated at least two "independent investigations" and have proceed with non-renewing or terminating Plaintiff's employment (as predicted and called for by Giovannini on August 30, 2021), even though the District does not even have the results of those investigations at the present time. Defendant's conduct was a termination of Plaintiff's property interest without good cause. As a direct and proximate result of that wrongful conduct, Plaintiff has been damaged as described below.

**D.    Title VII and Title IX Violations**

4.10    The conduct described herein is violative of both Title VII and Title IX. After submitting to the EEOC/TWC her complaint and after receiving a right a right to sue letter,

Plaintiff will ask the court for leave to amend to include those causes in this suit, as well.

### E.    Violation of the Texas Equal Rights Amendment

4.11    Defendant District has violated the Texas Equal Rights Amendment in that it has discriminated against Plaintiff on the basis of her gender. More specifically, the District is fully aware (and has been aware) of the wrongful conduct of a male, Giovannini, as described herein, Nonetheless, the District has permitted and/or cause the termination or non-renewal of Dr. Bennett, a female, while ignoring or supporting the grossly unfair and unlawful conduct of a male, Chancellor Giovannini. That discrimination is a violation of the Texas Equal Rights Amendment and Plaintiff seeks injunctive relief and equitable relief thereafter.

### F.    Substantive Due Process

4.12    The above-described conduct of the District and Giovannini is a violation of Plaintiff's right of substantive due process. The acts and omissions described herein above by the District and by Giovannini comprise arbitrary and capricious conduct by the Defendant District and its Chancellor and Board of Trustees and that arbitrary and capricious conduct is superimposed upon Plaintiff's contractual and property interest as described above. Plaintiff has been damaged as a direct and proximate result of that arbitrary and capricious conduct, as set out below.

## V.    DECLARATORY RELIEF

5.1    Additionally, and/or in the alternative, Plaintiff would show that a justiciable controversy has arisen regarding the rights and obligations afforded Plaintiff and Defendants, in part, pursuant the TCC Policies and Procedures including but not limited to those set out above. Plaintiff therefore seeks relief from this Court pursuant to 28 U.S.C. Sec. 2201(a) and/or Chapter 37, TEX. CIV. PRAC. & REM. CODE, declaring that such System Rules and/or Handbook of Operating Procedures, its policies, and the Texas Constitution, bar Defendant and its

administrators from the arbitrary penalties given to Plaintiff documented herein.

## VI.    DAMAGES

6.1    Plaintiff's annual salary at the relevant times was $207,200.00 per annum. Beginning February 1, 2022, she has been deprived of that salary in its entirety and has lost the benefit of her health insurance and other benefits. Plaintiff is entitled to her damages of lost income to be determined as we proceed, and she is entitled to front-pay for which the jury is entitled to speculate under Texas and Federal law. Plaintiff alleges, on information and belief, that she will be unable to obtain comparable employment at a comparable salary for many months if not years to come, despite the fact that she has begun the course of mitigating her damages by diligently searching for comparable employment, unsuccessfully. Thus, she has suffered a diminished earing capacity.

6.2    Plaintiff is entitled to recover a reasonable sum for her mental anguish, for which she here sues.

6.3    For a deprivation of procedural due process, Plaintiff is entitled, as a matter of law, to recover at least nominal damages and her attorney's fees.

## VII.    INJUNCTIVE RELIEF

7.1    To the extent necessary and in support of the injunctive relief sought herein, Paragraphs 3.1 through 3.33 of this Complaint are hereby referenced and fully incorporated into this section by this specific reference, as though fully set forth herein.

7.2    In addition to Plaintiff's damages sought herein, Plaintiff seeks temporary and permanent injunctive relief, specifically including an order from this Court enjoining Defendants from failing to reinstate Plaintiff forthwith to her position of employment together with all relevant benefits.

7.3    Given the constitutional violations by Defendant, including violation of the Texas Equal Rights Amendment such injunctive relief is available. Plaintiff has suffered and will suffer irreparable harm if Defendant is not enjoined as requested, and further, Plaintiff is without any other adequate remedy at law.

7.4    The intangible rights involved herein are unique and irreplaceable, so that it will be impossible to accurately measure, in monetary terms, the damages caused by the Defendant's actions. It is probable that Plaintiff will succeed in her claims, including her request for a permanent injunction. Additionally, the actions of Defendant will be shown to have clearly violated the constitutionally protected rights of Plaintiff, who continues to suffer irreparable and imminent harm and injury in the interim if an injunction is not granted. Moreover, the injury to Plaintiff outweighs the threatened harm the injunction will cause Defendant and granting the preliminary injunction will not disserve the public interest.

7.5    In order to preserve the status quo and/or status quo ante and the rights of Plaintiff during the pendency of this action, Defendant should be cited to appear and show cause why it should not be temporarily enjoined, during the pendency of this action, as set forth above.

7.6 In addition, and in the alternative, Plaintiff seeks a permanent injunction requiring Defendant to continue Plaintiff's employment in the position she held.

## VIII.    ATTORNEY'S FEES

8.1    Plaintiff is entitled to recover her reasonable and necessary attorney's fees both under 42 U.S.C Sec. 1988 and for breach of contract under Chapter 38 of the Civil Practice and Remedies Code, for which she here sues.

## IX.    CONDITIONS PRECEDENT

9.1    All conditions precedent for the filing of this claim have been met, except as may be specifically noted in this pleading.

## X.    DEMAND FOR JURY TRIAL

10.1    Plaintiff respectfully demands a jury trial before a jury of her peers.

### PRAYER

Plaintiff respectfully prays that the Court will grant judgment to Plaintiff providing for the following:

a.    the recovery of her actual damages; and/or

b.    at least the recovery of nominal damages;

c.    the recovery of her attorney's fees and expenses;

d.    a preliminary and permanent injunction enjoining the Defendant from failing to reinstate Plaintiff forthwith to her position of employment together with all relevant benefits;

e.    pre-judgment and post-judgment interest; and

f.    such other and further relief, both general and special, at law and equity, to which Plaintiff may show herself entitled.

Respectfully Submitted,

*/s/ Frank Hill*_____
Frank Hill            SBN  09632000
fhill@hillgilstrap.com

**HILL GILSTRAP, P.C.**
1400 W. Abram St.
Arlington, Texas  76013
(817) 261-2222
(817) 861-4685 FAX

**ATTORNEY FOR PLAINTIFF**